PAUL J. PFINGST, ESQ. (Bar No. 112967)
pfingst@higgslaw.com
HIGGS FLETCHER & MACK LLP
401 West A Street, Suite 2600
San Diego, CA 92101-7913
619-236-1551 FAX: 619-696-1410

Attorneys for Defendant
**ANDREW B. KATAKIS**

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA
### 501 "I" Street
### Sacramento, CA  95814
### (Honorable William B. Shubb)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW B. KATAKIS,<br><br>Defendant. | CASE NO.  2:11-CR-0511-WBS<br><br>**TRIAL BRIEF OF DEFENDANT ANDREW B. KATAKIS**<br><br>TRIAL :   1/28/2014<br>CTRM :   5 [14th floor] |

COMES NOW DEFENDANT ANDREW KATAKIS and submits the following trial brief for the assistance of the Court.

## I.

## BACKGROUND

In 2008, the international real estate bubble popped causing a global financial meltdown.  As a result, banks held massive numbers of defaulted home mortgages.  The banks foreclosed on the homes and put the homes up for public auction.  The scale of foreclosure activity and the number of homes auctioned was unprecedented.

The foreclosure crisis hit San Joaquin County particularly hard.  There were over 1,000 foreclosure filings in many months.  As a recent Stockton Record stated:

///

HIGGS FLETCHER & MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

108200-00001
1172211.1

2:11-CR-0511- WBS

Defendant Katakis Trial Brief

> Put another way, San Joaquin County - known demographically as the Stockton metropolitan area - saw more than 3,900 foreclosure filings in 2013, down 58 percent from the more than 9,300 filings the year before. That is a far cry from the height of Stockton's housing crisis, when in 2008, filings totaled more than 21,100 and topped 19,500 in 2009, said Daren Bloomquist, a RealtyTrac vice president.

Over a period of months a virtual tsunami of foreclosed homes flooded the San Joaquin auction market which was not prepared for the onslaught.

The evidence will show that during the period of 2008 and 2009 the high volume of foreclosures resulted in lenders (banks) severely lowering their opening bids far below what was owed them on the outstanding loans.  The lenders (banks) could not afford to have the volume of homes going through foreclosure and ending up in their inventory where they would have to manage them and have them on their books.  Therefore, in order to try to create demand amongst potential bidders, opening bid prices were lowered by the lenders (banks). The problem the lenders (banks) faced at the time is that there was an insufficient demand for foreclosed homes as compared to the volume available.  As such, many homes received no bid.  Investors such as Mr. Katakis, who could arrange financial backing sufficient to take advantage of these lower prices benefitted.

### A.    Bids For A Penny Over

In this matter, it appears that the Government has attempted to cherry pick 256 homes to which the alleged conspiracy to bid rig applied.  The Government argues that evidence of the conspiracy not to bid against one another is that many of such homes were acquired for one penny over the opening bid set by the bank.

In a vacuum where only 256 homes were foreclosed upon during such period, such an argument might be persuasive.  However, such argument shows a detachment from what was going on during this unique period of time.  For example, government witness and convicted co-conspirator Richard Northcutt told the Government in his initial interview:  "The fact that a property is bought for a penny

HIGGS FLETCHER & MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

108200-00001
1172211.1

2

2:11-CR-0511- WBS

Defendant Katakis Trial Brief

1  over at the public auction does not necessarily mean that the property was subject to
2  the conspirators' agreement to not bid at the public auction. Sometimes it just
3  means that nobody else wanted the property. Also, it is usually a good strategy to
4  wait to say "a penny over" until right before the auction says "sold". If one bids
5  before then, someone else will immediately bid higher."
6      This deluge of properties created financial opportunities for well financed,
7  astute and risk-tolerant entrepreneurs who could identify real estate bargains, buy
8  the properties, and "flip" (resell) them.
9      As market conditions and foreclosure inventories changed during the 2008-
10 2009 period, the banks, auction houses and investors changed their procedures and
11 strategies to get the properties sold. Various joint ventures and partnerships were
12 formed to purchase and quickly resell properties. Some of the joint ventures were
13 more formal than others. Some had different economic models than others. The
14 single common strategy among investors was to quickly flip a property to avoid the
15 costs and risks associated with holding an inventory of unsold and empty homes.
16     The number of bidders attending the San Joaquin auctions grew as word of
17 bargains spread and as construction work disappeared. Dozens of bidders attended
18 the auctions. It was not unusual to see the auctioneer enveloped by 50 or 60 bidders.
19 Flipping residential property became the subject of seminars, cable television series,
20 books and self-help tapes. Some of the television shows are still being produced to
21 this day.
22     These other auction attendees were generally professionals. They included
23 real estate brokers, licensed contractors, professional "flippers" and vertically
24 integrated joint ventures. Some bidders specialized in upper end properties, others
25 focused on lower priced properties and yet others looked for value across the
26 spectrum. Some bidders focused on small geographic areas and others operated
27 statewide. On any one day many millions of dollars would be invested by purchasers
28 in San Joaquin.

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

108200-00001
1172211.1

3

2:11-CR-0511- WBS

Defendant Katakis Trial Brief

Sometime in 2008 or 2009 a group of investors agreed not to bid against one another at the San Joaquin auctions. This group was led by Wiley Chandler (the "Wiley Crew"). Most of Wiley Crew have admitted guilt and are expected to testify in return for sentencing consideration. Over time members of the Wiley Crew changed and the Wiley Crew strategies evolved as the foreclosure market changed.

It is generally conceded that Wiley Chandler was a disagreeable bully and cheat . It is equally agreed that Wiley Chandler was unrivaled as an astute appraiser of Stockton area real estate. Wiley Chandler had been buying property at San Joaquin auctions for decades and was well known by those connected with the auctions. His financial partner was Richard Northcutt, another auction regular. Other members of his crew were included long time auction attendees with whom he had done business in the past. For example, a former defendant and now prosecution witness, Tony Ghio, was a San Joaquin foreclosure auction regular for decades. It was Mr. Ghio who kept notes for the Wiley Crew and helped Wiley Chandler steal, even from his own Crew members.

Chandler and Northcutt designed and operated an efficient and capable organization that purchased large numbers of properties. Their employees scoured San Joaquin to appraise auction properties. As stated by Northcutt: "In 2008, Chandler and Northcutt researched all the properties coming up every day, around 150-200 properties a day. They had a realtor who worked for them 16 hours a day. Chandler and Northcutt had extensive notes on the properties being sold every day, more than anyone else. No one was as thorough as Chandler and Northcutt. Most of the regulars were there just for one or two properties a day."

The Wiley Crew met and identified some desirable foreclosed properties coming up for sale and agreed not to bid against one another for those properties. Often other bidders would not have time to appraise the property or would run out of money before a property was auctioned. When either of those events happened, the Wiley Group would get a good buy.

108200-00001
1172211.1

4

2:11-CR-0511- WBS

Higgs Fletcher & Mack LLP
Attorneys At Law
San Diego

Defendant Katakis Trial Brief

One of the Wiley Group, usually Wiley Chandler, would bid on behalf of the Group. If Wiley won the bid he would try to quick flip his rights to buy the property to someone else. The group would then split the profit. This business model allowed the Wiley Crew to purchase the property without tying up his capital or having to deal with the hassle of preparing properties for resale. A quick flip of the Groups contractual rights allowed them to invest in even more properties.

The Government alleges that the Wiley Crews' agreement not to bid against one another was a per se violation of anti-trust laws. That may be so but defendants Katakis, Parker and Longley deny being a part of Wiley Chandlers operation.

## B. Andrew Katakis Was Not Part Of The Wiley Crew

Mr. Katakis is an investor. His primary business is an asset recovery company that does business in a number of states. In 2009 the business employed approximately 20 people. Mr. Katakis also owned California Equity Management Group (CEMG), a separate company he created to participate in real estate transactions. Mr. Katakis had occasionally participated in property acquisition joint ventures with a variety of partners over the prior decade.

During the conspiracy period Mr. Katakis teamed with Robert Florsheim to create Lenders Financial LLC (Lenders). Florsheim invested millions of dollars and was active in the operation of Lenders. It was Lenders that took title to most of the properties on the Governments 256 property list.

The Governments Trial Brief parses its words very carefully when discussing Mr. Katakis' alleged participation in the Wiley Crews bid rigging scheme. The Government admits, as it must, that Mr. Katakis did not attend the auctions. The Government's case relies primarily on the testimony of Steve Swanger who has been immunized in return for testimony.

Just before coming to Global, Swanger had established a business named Swan Construction. On December 10, 2007, Swanger and Swan Construction were issued a Class B contractor's license by the California Contractor's State License Board. Steve

108200-00001
1172211.1

5

2:11-CR-0511- WBS

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

Defendant Katakis Trial Brief

1  Swanger was the listed as the sole owner.  Before this, Swanger had been a licensed
2  California real estate agent since 1998 and a licensed broker since 2002.  For a
3  number of years before working for Global, Swanger had worked in the line of
4  acquiring distress properties.

5  It did not take long after coming to Global for Swanger to determine that he
6  was not doing work for Global which he truly wanted to do.  In fact, it is likely he
7  knew this before coming to work for Global given he had just acquired his
8  contractor's license – something that was of no use to him at Global.  It will be clear
9  from the evidence that Steve Swanger did not believe he was earning enough money
10 to allow him to recover from his personal bankruptcy and support his family.  Thus,
11 Steve Swanger saw the housing meltdown as a particularly well-timed opportunity
12 to get into the business of acquiring homes going through foreclosure.

13 With his contractor's license, Swanger had the ability to rehabilitate homes.
14 With his experience in acquiring distressed properties, he had knowledge of how the
15 foreclosure process worked.  With this real estate license, he had experience in
16 understanding how the process from foreclosure to eventual sale worked.  As such,
17 he approached Mr. Katakis with a business proposition – if Mr. Katakis would
18 provide the financial backing to acquire foreclosed homes and a base of operation
19 from which to work, Steve Swanger would take care of all the details in exchange for
20 a share of any profits made from the endeavor.  Mr. Katakis agreed.

21 Mr. Swanger officially left his employ at Global on August 1, 2009.  Thereafter,
22 Mr. Swanger and Mr. Katakis agreed in writing about the division of responsibilities
23 between their businesses and also upon how profits would be split between the
24 businesses.  In sum, it was agreed that responsibility for (1) attending foreclosure
25 auctions; (2) bidding; (3) taking care of paper work; (4) rehabilitating the homes;
26 and (5) preparing them for sale would be Mr. Swanger's business responsibility.
27 Mr. Katakis would be responsible for making funds available to purchase the homes
28 and overseeing the eventual sell of same.  CEMG and Swan split the net profits with

HIGGS FLETCHER & MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

108200-00001
1172211.1

6

2:11-CR-0511- WBS

Defendant Katakis Trial Brief

75% to CEMG and 25% to Swan. It was mutually agreed that Mr. Katakis would have minimal day-to-day involvement in the foreclosure business.

Virtually all of the properties forming the basis of the Governments case were located and bid for by Swanger, or one of his employees. The evidence will reveal that Steve Swanger was administratively challenged. He was unable to keep his books. He was unable to keep up with his work. As had been agreed upon at the beginning of the relationship with Swanger, Swan Construction was to handle all the administrative details related to rehabilitating homes purchased a foreclosure. Since he was cash poor, in order to afford to pay for the labor and work required for the repairs, Mr. Swanger would regularly invoice Lenders Financial or CEMG. The system devised for such invoices proved to be unsound and lacking in internal controls as Mr. Swanger had the authority to prepare invoices and then the authority to sign off approving same. The evidence will show that Mr. Katakis' then would be presented with stacks of checks to sign.

The entire Swan operation was being monitored by Robert Florsheim who appointed Nancy Sebok, an accountant, to oversee his financial interest in Swanger's operations.

In spite of the extensive oversight by Mr. Florsheim, evidence will show that Mr. Swanger ultimately joined the Wiley Crew and stole from Mr. Katakis and Florsheim.

Mr. Katakis was not aware of Swanger's participation in the secondary auctions. He had instructed Swanger not to become involved in any such activity (Swanger acknowledges having been so instructed). During all of 2008 and most of 2009 Steve Swangers employee, Mark Tillotson, routinely bid against the Wiley Group. Tillotson has told prosecutors that he was never given instructions not to bid against anyone. The testimony will show that the competitive bidding stopped immediately Steve Swanger's twin brother Ken Swanger replaced Mark Tillotson in the summer of 2009.

HIGGS FLETCHER & MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

108200-00001
1172211.1

7

2:11-CR-0511- WBS

Defendant Katakis Trial Brief

In July of 2009, when Mr. Katakis and Florsheim learned of Swanger's collusion with Wiley Chandler they ordered that it stop. They were assured by Steve Swanger that the relationship with Wiley would be discontinued. Swanger lied. With Steve Swanger's agreement and assistance Northcutt and Chandler and other members of their conspiracy continued to make a substantial profit off of Lenders and CEMG merely due to inflated bids.

Chandler and Northcutt always knew what properties to bid on and how high to bid in the secondary auction to maximize their take because Swanger admits he told them beforehand which properties he wanted and for how much. Properties thus sold in a distorted second auction marketplace created by Chandler and Northcutt and others at prices far above what the market demanded at the auction. The evidence will show that Lenders was bidding against itself at the auctions. When Lenders was outbid at a secondary auction Swanger, at Chandler's insistence, paid for the property anyhow at the highest amount bid. The Governments Trial Brief alleges that CEMG paid out over 1 million dollars and "received" $350,000 in "payoffs" at secondary auctions. The vast majority of the $650,000 deficit enriched the Wiley Crew.

The government's case hinges upon agreement between Chandler, Swanger and others. Given the damage caused to the businesses operated by Andrew Katakis and Florsheim by the secondary auction process, it is difficult to understand how any reasonable person could believe Andrew Katakis agreed to secondary auctions. Common sense dictates otherwise. On the other hand, Chandler, Northcutt, and the Swangers all directly benefitted from the system. The benefits they received will be demonstrated through the course of the trial.

This ongoing theft from Lenders and CEMG was accomplished by a series of false representations by Steve Swanger to Mr. Katakis and Florsheim. The business was so profitable it was assumed that Swanger was doing a good job and his management shortcomings were overlooked.

Higgs Fletcher & Mack LLP
Attorneys At Law
San Diego

108200-00001
1172211.1

8

2:11-CR-0511- WBS

Defendant Katakis Trial Brief

Mr. Katakis has been charged with Obstruction. The claim is that Mr. Katakis downloaded a program to erase inculpatory e-mails. The evidence will show that this charge is the result of the Governments unfamiliarity with Microsoft Outlook, the e-mail program used by CEMG. Mr. Katakis did not erase any e-mails. The program that was downloaded did not have that feature and a forensic expert will testify for the defense that a review of the computer audit trail discloses that no e-mails were deleted.

## II.

## ISSUES

### A. The Witness Interview Notes May be Used to Impeach

Various interviews during proffer sessions with Government witnesses were contemporaneously recorded by a designated note taker. The contemporaneous typed or handwritten notes are the functional equivalent of stenographic statements. The notes were turned into typed reports which have been provided.

The notes are the most reliable evidence of what was said during the sessions and they undoubtedly contain verbatim statements from witnesses. The Government argues that the witness interview reports should not be admitted as extrinsic evidence of inconsistent prior statements because they are not verbatim transcripts and have not been authenticated by the witnesses. The Government directed the Courts attention to United States v. Almonte, 956 F. 2d 27 in support of this proposition. However the facts in that case are not analogous to the facts here. In Almonte the Court wrote:

> Here, Almonte's only evidence that Ray's notes were
> verbatim was the assertive form of the notes. Judge Haight
> considered the form of the notes, and reasonably
> concluded that a rational jury could not attribute the
> words to Travers. As the district court explained, Ray's
> notes look and sound not like a memorialization of
> Travers's exact words, but like a quickly jotted summary.
> We therefore find that the district court did not abuse its
> discretion in finding that Ray's notes were Ray's shorthand

Higgs Fletcher & Mack LLP
Attorneys At Law
San Diego

108200-00001
1172211.1

9

2:11-CR-0511- WBS

Defendant Katakis Trial Brief

characterization of Travers's account of Almonte's confession, and that the notes "did not purport to memorialize all of [Travers's] statements." Leonardi, 623 F.2d at 757.

The defense has not been provided "a quickly jotted summary" of a proffer session. The defense has been provided dozens of pages of very detailed notes reporting specific witness statements about specific properties and specific conversations. The Government took contemporaneous handwritten verbatim notes and then simply transposed the statements onto a report without quotation marks.

If portions of the reports aren't admitted an agent will be called to testify about the inconsistent statements that will certainly be elicited from Government witnesses. Summoning the Agent would be a wasteful and time consuming way to impeach witnesses. Unless the prosecution is concerned that the reports do not accurately reflect interviews the prosecutors themselves conducted there is no reason not to use them.

## B.   The Government Must Correctly Identify Individuals and Entities

There are a number of legally distinct entities that will be the subject of testimony. The Government prefers to group to the entities collectively as "Katakis" entities or "Katakis controlled" entities. As a matter of law some of the entities are not "Katakis" entities.

As noted above, most of the subject properties that allegedly involve Mr. Katakis were purchased by Lenders Financial (Lenders). Lenders was a member managed LLC created under California law. It had a formal operating agreement that gave equal control to Robert Florsheim and Mr. Katakis. Florsheim was intimately involved with the activities of Lenders (the Government declines to say if he will be immunized or testify). Florsheim invested millions of dollars in Lenders and closely monitored Steve Swanger's day-to-day activities. Florsheim is an accomplished developer and licensed contractor with a long career in construction management.

HIGGS FLETCHER & MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

108200-00001
1172211.1

10

2:11-CR-0511- WBS

Defendant Katakis Trial Brief

Lenders Financial was not a "Katakis" entity any more than it was a "Florsheim" entity.

The Government has referred to Swan Construction (Swan) as a "Katakis" entity. Swan is a "dba" of Steve Swanger. It isn't an entity at all. Swan Construction is only a name used by Steve Swanger, who was a sole proprietor. Swan (or Swanger) hired its own staff, was bonded, paid employees, deducted employee taxes, paid workers comp fees acquired insurance and committed its own crimes. Swan was, in all respects, run by the license holder, Steve Swanger.

It will confuse the record if the prosecution refers to the "Katakis Entities" and the defense refers to the "Florsheim Entities" or the "Swan Entities". We request that an entity with a separate legal identity be referred to by name.

## C.     Joint Ventures Are Recognized By California Law

The Government is aware that Mr. Katakis participated in joint ventures and partnerships to purchase property. Some of those properties are contained in the Governments list of 256 properties. Joint ventures and partnerships formed to purchase auction properties are legal. There will be evidence of multiple and distinct joint ventures in this case. Some joint ventures were of very short duration as one or more of the participants changed his mind and asked to withdraw. The remaining joint venturers would occasionally buy out the withdrawing partnership interest. Every joint venture property was not purchased or handled in the same way. The Governments claim that the 256 properties were handled in a cookie cutter fashion has the virtue of simplicity but the vice of inaccuracy.

The California Corporations Code does not require that joint ventures be formal or written. They do not have to exist for any minimum period of time. The Uniform Partnership Act permits joint venturers to join and part at their pleasure and convenience. Two or more people may join a joint venture and then withdraw without the need for any formalities. The distinction between joint ventures and partnerships is more semantic that anything else. . Cal. Corp. Code § 16101 et. seq.

HIGGS FLETCHER & MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

108200-00001
1172211.1

11

2:11-CR-0511- WBS

Defendant Katakis Trial Brief

The Government inference that joint ventures are suspicious unless scrupulously organized and documented according to the Governments preferred manner is contrary to California law and conflicts with the on the ground realities of a foreclosure auction environment.

### D. Private Sector Auctioneers Have Wide Flexibility In The Manner That Auctions Are Conducted

California foreclosure auctions are private sector transactions regulated by statute.  California Civil Code § 2924.  Within the confines of the Civil Code buyers and sellers are free to make whatever modifications or agreements they believe will facilitate the process.  The Civil Code gives the auctioneer the right to pre-qualify buyers but does not require the auctioneer to do so.  Civil Code § 2924h(b)(1).  To the extent the prosecution's trial brief argues otherwise the Government is mistaken.

The Government brief criticizes defendant Longley for such things as arranging the order of auction property for the "convenience" of the Chandler Crew.  If so, this common sense strategy is what any private sector business would do to insure the participation of volume buyers.  An auctioneer burdened with selling hundreds of properties who did not accommodate volume buyers would be self-defeating.  An auction is a business and an auctioneer is not a public employee.  California Civil Code Title 2.95

### E. A Winning Bidder May Assign Or Sell His Contractual Rights

The winning bidder at an auction may assign his rights.  Civil Code § 954; McCown v. Spencer 8 Cal. App. 3d 216, 219.  There is no statutory requirement that a winning bidder take personal title to the property.  The Government, without authority, incorrectly claims that all auction documents must transfer title to the winning bidder or they are fraudulent.

There is nothing, for example, that prohibits a father from winning a bid and then vesting title in his child's name or even in the name of a complete stranger.  The receipt of funds, certificate of sales and bid logs are not designed to force a winning

108200-00001
1172211.1
12
2:11-CR-0511- WBS

Defendant Katakis Trial Brief

Higgs Fletcher &
Mack LLP
Attorneys At Law
San Diego

bidder to take title to property. Those documents are designed to dispose of a property an agreed price. The auction documents have a designated area for a title holder to be identified. As long as the winning bid is paid, title can be put in the name of whomever the bidder chooses. The auctioneer has no interest in who ultimately takes title to a property.

### F.  Government Expert Keith Bockus Must Limit His Testimony To Accounting

The Government has retained Keith. Bockus, a part-time associate professor of accounting, to testify as an expert. The defense objects to the proposed scope of Mr. Bockus' testimony. Mr. Bockus has opined that certain checks from CEMG and Lenders were "payoffs" by Mr. Katakis. He has grouped various separate entities as "Katakis Entities" when they aren't. Mr. Bockus intends to regurgitate the prosecution's case and give his opinion that certain payments are "consistent with" Katakis-Swan Payoffs".

There is no disagreement that Steve Swanger routinely invoiced CEMG and Lenders for many millions of dollars as a routine and necessary part of the enterprise. Mr. Bockus' personal opinion about the criminal culpability of the person who paid the money is irrelevant and uninformed. It is not within the expertise of an adjunct associate accounting professor to opine on the motives behind the payments or whether the payments were intended to be illegal payoffs.

For example, Mr. Bockus' report states (in bold type no less) that "The Katakis Entities made payoffs to the alleged co-conspirators in consideration for acquiring properties that were sold in bid rigged auctions (Katakis-Swan-Northcutt/Chandler Payoffs)". This opinion is nothing more than clairvoyance not accounting expertise.

The defense contends that this type of expert testimony runs afoul of Rule 704(a) and (b). U.S. v. Barile, 286 F.3d 749, 760. Whether Mr. Katakis made a "payoff" to bid riggers in return for properties comments on Mr. Katakis knowledge and' intent and is therefore inadmissible. U.S. v. Ibarra 493 F.3d 526, 532. It is not a

Higgs Fletcher & Mack LLP
Attorneys At Law
San Diego

108200-00001
1172211.1

13

2:11-CR-0511- WBS

Defendant Katakis Trial Brief

proper matter of expert opinion and is nothing more than using a college professor to make a closing argument for the government.

### G. Steve Swanger's Inconsistent Statements To Attorney Pat Hanly Are Admissible

In prior discovery proceedings the defense sought the entire case file of attorney Pat Hanly. Mr. Hanly simultaneously represented both Mr. Swanger and Mr. Katakis. Mr. Hanly was first retained by Mr. Swanger. Hanly required Swanger to sign a detailed conflict waiver before agreeing to represent Mr. Katakis. When the Government raised an objection to the joint representation attorney Hanly required both Swanger and Mr. Katakis to sign another waiver. Both waivers explained that communications between Hanly and either Swanger or Mr. Katakis wouldn't be confidential. Mr. Hanly owed an undivided duty of loyalty to both clients and could not ethically withhold from Mr. Katakis information pertaining to the subject of his representation. This matter was fully briefed in discovery motions and the authorities won't be repeated here.

Mr. Hanly has only provided records that followed his representation of Mr. Katakis. The defense believe Hanly's records will reveal that Steve Swanger was deceiving Mr. Katakis about what he doing at the time of the secondary auctions.

The defense asks the court to examine Mr. Hanly's records in camera to determine whether they must be produced to the defense.

DATED: January 17, 2014           HIGGS FLETCHER & MACK LLP

                                  By:/s/ **Paul Pfingst**
                                  PAUL J. PFINGST, ESQ.
                                  Attorneys for Defendant
                                  ANDREW B. KATAKIS

HIGGS FLETCHER & MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

108200-00001
1172211.1

14

2:11-CR-0511- WBS

Defendant Katakis Trial Brief

**CERTIFICATE OF SERVICE**

Counsel for Defendant certifies that the foregoing pleading is true and accurate to the best of his information and belief, and that a copy of the foregoing document has been served this day upon:

U S Attorney CR
Efile.dkt.gc2@usdoj.gov

| | |
|---|---|
| Tia Snow Milder<br>US DOJ/Antitrust Division<br>450 Golden Gate Avenue<br>Room 10-0101<br>San Francisco, CA 94102<br>**415-436-6600 F: 415-436-6684**<br>Tai.milder@usdoj.gov<br>**PLAINTIFF USA** | Kelsey Linnett<br>US DOJ/Antitrust Division<br>450 Golden Gate Avenue<br>San Francisco, CA 94102<br>**415-436-6600 F: 415-436-6684**<br>Kelsey.linnett@usdoj.gov<br>**PLAINTIFF USA** |
| Anna Tryon Pletcher<br>US DOJ/Antitrust Division<br>450 Golden Gate Avenue<br>Room 10-0101<br>San Francisco, CA 94102<br>**415-436-6600 F: 415-436-6684**<br>Anna.pletcher@usdoj.gov<br>**PLAINTIFF USA** | May Lee Heye<br>US DOJ/Antitrust Division<br>450 Golden Gate Avenue<br>San Francisco, CA 94102<br>**415-436-6600 F: 415-436-6684**<br>May.heye@usdoj.gov<br>**PLAINTIFF USA** |
| Scott L. Tedmon, Esq.<br>980 Ninth St., 16th Floor<br>Sacramento, CA 95814<br>916-449-9985 FAX: 916-446-7104<br>tedmonlaw@comcast.net<br>**DEFENDANT DONALD PARKER** | Matthew Bockman, Esq.<br>Veronica R. Orozco, Esq.<br>Federal Defenders<br>801 "I" Street, 3rd Floor<br>Sacramento, CA 95814<br>916-498-5706 x242 F: 916-498-5710<br>matthew_bockmon@fd.org;<br>veronica_r_orozco@fd.org<br>**DEFENDANT W. THEODORE LONGLEY** |

Higgs Fletcher & Mack LLP
Attorneys At Law
San Diego

108200-00001
1172211.1

15

2:11-CR-0511- WBS

Defendant Katakis Trial Brief

Thomas A. Johnson, Esq.
400 Capitol Mall, #1620
Sacramento, CA 95814
916-442-4022 FAX: 916-442-4262
taj@tomjohnsonlaw.com
**DEFENDANT ANTHONY B. JOAQUIM**

By electronic mail – I hereby certify that I electronically transmitted the attached document(s) to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the above-listed CM/ECF registrants.

DATED: January 17, 2014                HIGGS FLETCHER & MACK LLP

By: /s/ **Paul Pfingst**
    PAUL J. PFINGST, ESQ.
    Attorneys for Defendant
    ANDREW B. KATAKIS

HIGGS FLETCHER & MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

108200-00001
1172211.1

16

2:11-CR-0511-WBS

Defendant Katakis Trial Brief